Jay C. Morse Trust, The Cleveland Trust Company, Trustee v. Commissioner.
Morse Trust v. Commissioner
Docket No. 9058.
United States Tax Court
1947 Tax Ct. Memo LEXIS 141; 6 T.C.M. (CCH) 855; T.C.M. (RIA) 47204; July 14, 1947
Charles O. DeWoody, Esq., for the petitioner. L. R. Bloomenthal, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: This case involves a deficiency in income tax in the amount of $13,160.33 for the year 1942. The question involved is as to whether or not the Commissioner properly determined that $31,211.77, representing the sum of $35,000 less deductions allowed of $3,788.23 for attorneys fees and other expenses, which was received in 1942 in settlement of a claim against the Superintendent of Banks in the State of Ohio in charge of the liquidation of the Union Trust Company of Cleveland, Ohio, constituted taxable income under section 22(a) of the Internal Revenue Code. *142 Findings of Fact We incorporate herein as a part of our findings the stipulation of facts and exhibits attached thereto filed at the hearing. The following are the facts which we deem material for an understanding of the issues, part of which are based on the stipulation and exhibits, and part on the oral and written evidence produced at the hearing: The fiduciary tax return of the petitioner for 1942 was filed with the collector of internal revenue for the eighteenth district of Ohio at Cleveland, Ohio. The Jay C. Morse Trust was created by the will of Jay C. Morse, deceased, who died in 1906. His executors delivered certain assets to the Citizens Savings and Trust Company of Cleveland, Ohio, as trustee. The Citizens Savings and Trust Company thereafter was merged with certain other banking institutions into the Union Trust Company, an Ohio corporation, which thereupon succeeded to the duties of said trustee and undertook all of the liabilities of its predecessor trustee. On June 15, 1933, the Superintendent of Banks of the State of Ohio took possession of the assets, business and property of the Union Trust Company for the purpose of liquidation and distribution. The Cleveland *143 Trust Company on January 24, 1934 was named successor trustee to the Union Trust Company and was vested with title as successor trutee to all of the property and rights of said trust estate. Said Cleveland Trust Company thereupon qualified and has since acted as trustee. It kept the books of said trust and made its tax returns on a calendar year basis. The beneficiary to receive the income of said trust is Carolyn Morse Ely. The principal thereof upon the death of the said Carolyn Morse Ely is to be distributed among certain devisees in remainder. Prior to June 15, 1933, the Citizens Savings and Trust Company and its successor, Union Trust Company, as trustee, had invested funds of the trust in a various collection of securities. On July 10, 1937, the Cleveland Trust Company as trustee duly filed its claim with the Superintendent of Banks asserting that its predecessor trustees had committed breaches of trust: "(a) by the purchase of certain land trust certificates for the trust which were unauthorized or in which it had a financial or personal interest. The total amount invested in these certificates was $185,016.25; "(b) The Union Trust Company in violation of its trust *144 responsibilities retained shares of its own stock in the trust estate with resulting double liability thereon, when it should have disposed of said shares within a reasonable time." The claimant demanded a return of the moneys which the trustee had so invested, together with $55,000 which was the claimed market value of the Union Trust Company stock within the year following the assumption of the trusteeship by the Union Trust Company and the claimant also asked for a return of the $10,000 which it had been compelled to pay as a double liability assessment on said stock, together with six per cent per annum on the principal amount claimed. While this claim was pending the National City Bank of Cleveland on behalf of a Stone trust, to which it had succeeded the Union Trust Company as trustee, instituted litigation against the Superintendent of Banks to determine the rights of the successor trustees in cases similar to that of the Jay C. Morse Trust. This case, in the course of its litigation in the lower courts, had developed a so-called Stone Formula whereby a self-dealing trust company, operating under the banking laws of the State of Ohio, was held to be liable to repay the amount *145 of any trust funds which it had improperly invested, plus six per cent interest thereon from the date of the purchase of the stock to the date at which the Ohio Superintendent of Banks assumed control of the defaulting trust company, less the sum of the actual income received by the trustee from the date of the purchase of the stock to the date of settlement, together with the market value of the stock on the date of settlement. The Supreme Court of Ohio, on May 28, 1941, approved this Stone Formula with the modification that the interest to be added to the amount the trustee wrongfully invested was reduced from six per cent to four per cent. Because of the Stone case the Cleveland Trust Company deferred negotiations with the Superintendent of Banks for the settlement of its claim until the fall of 1941, but in the interval it had investigated the records of its predecessor trustee and had determined that a part of the purchases made were in all ways legal. Therefore, at the initial conference over the settlement of the claim, the petitioner and the office of the Superintendent of Banks agreed that certain of said purchases for which a claim had been filed did not constitute unauthorized *146 transactions and these securities were removed from consideration. Another group which had been acquired unlawfully had produced income to such an amount and had maintained favorable market values in such a way that the trust estate had suffered no loss therefrom under the Stone Formula. During the course of the conference this second group received minor additions due to the increase of the market value of the securities involved. The remaining land trust certificates on which the trust had suffered a loss, by agreement of the parties, had, some time prior to July 9, 1942, been reduced to the following items: Altamount Realty LTC's Del Prado Property LTC's Willoughby Terminals LTC's C.A.C. Building Site LTC's Hippodrome Building Site LTC's Mortgage Trust Fund No. 1 Union Trust Stock (including paid double liability) The trustee at different times had computed the amount of liability on the above items in slightly varying amounts. Initially the trustee computed his loss as $30,501.02 on the land trust certificates alone. On May 28, 1942, the trustee estimated in an office memorandum that in the event of litigation $27,801 could be recovered on the land trust certificates *147 and $2,929 on the Union Trust Company shares. Repeated conferences were held between representatives of the petitioner and the Superintendent of Banks in which these computations were mutually discussed. In these conferences the petitioner was also insisting that in addition to the above listed land trust certificates on which the parties had agreed there was liability and also had agreed that the Stone Formula should apply in computing that liability, the Union Trust Company had engaged in self dealing in the purchase of $19,837.50 worth of Van Sweringen 6s of 1935. The Superintendent of Banks, however, in all of the conferences most emphatically denied all liability for the Van Sweringen purchases, and admitted liability only with respect to the following securities and in the following amounts: Net Liability
$18,000., original amount of Altamont Realty LTC's
$ 4,904.98
6,000., original amount of Del Prado Property LTC's
4,857.30
10,000., original amount of Willoughby Terminals LTC's
844.22
25,000., original amount of C.A.C. Building Site LTC's
13,641.81
6,720., original amount of Hippodrome Building Site LTC's
2,886.40
40,000., original amount of Mortgage Trust Fund No. 1
545.51
400 shares Union Trust Stock (including paid double liability)
2,129.56
$29,809.78
*148 The computations of loss on land trust certificates made by petitioner and the Superintendent of Banks were based upon the retention of these certificates by petitioner. In determining the amount of the liability, the market value of each certificate was subtracted from its cost, thus arriving at the amount of principal loss. The latter amount was further adjusted by subtracting therefrom the amount by which the income received on the certificate from the date acquired to date of settlement exceeded four per cent interest to June 15, 1933. In the one instance of the Del Prado certificates, where the four per cent interest exceeded the income by $297.30, the excess was added to the principal loss. In order to escape a possible liability of $37,792.95 which he thought he might be obligated to pay because of the admitted liability on land trust certificates of $27,680.22 and liability arising from double liability assessment of $10,000 plus interest of $112.73, the Superintendent of Banks offered to settle the claim for $35,000 and to permit petitioner to retain its Union Bank of Commerce stock which was valued at $1,400. On August 31, 1942, a certificate of claim was issued to *149 the petitioner for $35,000 and the petitioner agreed to the following releases: "IN CONSIDERATION of the issuance and delivery of said certificate of claim the Successor Trustee hereby releases and forever discharges The Union Trust Company and the Superintendent, and each of them, from any and all claims, demands, actions or rights of action of every kind or nature whatsoever in favor of the Successor Trustee and the beneficiaries of said trust, or any of them, and in any way arising out of or in connection with the trust and trust estate created by the Last Will and Testament of Jay C. Morse, deceased, or in any way arising out of or in connection with the acts or omissions to act of said The Citizens Savings and Trust Company and of The Union Trust Company in the course of their respective duties as trustees under said Last Will and Testament, or in any way connected with or arising out of the acts or omissions to act of The Citizens Savings and Trust Company, The Union Trust Company or the Superintendent of Bank, or any of them, in the administration of said trust, including, without limiting the generality of the foregoing, all claims, demands, rights, actions or causes of action *150 growing out of or arising from the Proof of Claim heretofore filed and identified on the records of the Superintendent as Claim Number NR-0289. "The Successor Trustee has entered into this agreement in its behalf and in behalf of all the beneficiaries of said trust and hereby warrants that it has full and complete authority to act with respect to all matters herein contained. "The provision hereof shall be binding upon and shall inure to the benefit of the parties hereto, the beneficiaries of said trust and their respective heirs, executors, administrators, successors and assigns." Of the $35,000 received by petitioner, $27,680.22 is allocable to the land trust certificates and $7,319.78 to the double liability assessment on the Union Trust Company stock. The following table shows the fair market value at date of settlement, and cost, of the securities upon which the Superintendent of Banks and the Cleveland Trust Company agreed that a loss had been sustained by the trust: Name of Security
Market Value
Cost
Union Trust Company Certificate of Participation in Mortgage
Loan Trust Fund No. 1 ($8,480 of unliquidated principal at 44)
$ 3,763.20
$ 40,000.00
Altamont Realty Company Land Trust Ctf.
4,320.00
18,000.00
C.A.C. Building Site Land Trust Ctf.
6,750.00
24,562.50
Del Prado Properties Land Trust Ctf.
1,440.00
6,000.00
Hippodrome Building Company Land Trust Ctf.
1,785.00
6,720.00
Willoughby Terminals Company Property Land Trust Ctf.
4,000.00
10,000.00
$22,058.20
$105,282.50
*151 Prior to the date of settlement there had been distributed to the trust in partial repayment of the Union Trust Company Certificate of Participation in Mortgage Loan Trust Fund No. 1 principal in the amount of $31,520. Before adjustment, therefore, the principal loss on the land trust certificates amounted to $51,704.30 ($105,282.50 less $22,058.20 plus $31,520.) The difference between $51,704.30 and $27,680.22 consists of income received in excess of 4 per cent return on amount invested in certificates which was used to reduce amount of principal loss. In the case of the Del Prado certificates where the four per cent return exceeded the income by $297.30, this amount was added to the principal loss of $4,560. No allowance was made in the settlement for any loss resulting from unlawful retention of the Union Trust Company stock, except that resulting from the payment of the double liability assessment, as the Superintendent of Banks determined that prior to June 15, 1933, the trust had realized, as a result of dividends and sales of part of this stock, $7,983.17 in excess of its investment. He also determined that this excess could not be credited against the loss resulting from the *152 double liability assessment as the latter was a loss to the trust occurring after the Union Trust Company had ceased to be trustee. The Superintendent therefore settled what he determined to be a liability of $37,792.95 ($27,680.22 plus $10,112.73) for $35,000. On December 2, 1942, the Trustee sold the Del Prado Land Trust Certificates of the face amount of $6,000 for the sum of $2,550. As shown above, the cost of these certificates was $6,000. Against said cost the trustee credited the sum of $1,686.99, which represented the portion of the $31,211.77 received in settlement allocated thereto. In computing its loss upon the sale, the trustee treated the cost thereof as $4,313.01, resulting in a long-term loss of $1,763.01, of which 50 per cent or $881.50 was taken into account as a long-term loss by the trustee in making its return for the year 1942. Except for the Del Prado Land Trust Certificates, the trustee at the close of the taxable year 1942 held as part of the assets of the trust estate all of the certificates shown in the foregoing table. The first installment of double liability upon the Union Trust Company stock was paid in 1935 in the sum of $6,970. In its return for *153 that year the trust reported gross income of $55,676.41, deductions of $11,218.48 (including a claimed ordinary loss of $6,970), and a net income of $44,397.33. The balance of the double liability was paid in 1936, in the sum of $3,030. In its return for 1936, the trust reported gross income of $66,453.25, deductions of $7,940.26 (including a claimed ordinary loss of $3,030), and a net income of $58,512.99. Except as herein set forth, the trustee made no other sales of any of the securities embraced in its claim against the predecessor trustee for breach of trust, and took no deductions during the years 1933 to 1942, inclusive, as capital losses, worthless securities, bad debts, or otherwise, in connection with any of the securities listed in the claim. In the case of each of the securities which both parties agreed occasioned the liability on the part of the Union Trust Company, the amount of income actually received from such securities was returned by the trust for Federal tax purposes and the income tax thereon was paid. Following the receipt by the petitioner herein of the $35,000 payment petitioner applied the entire amount thereof, less necessary expenses in the amount *154 of $3,788.23, to the principal fund of the trust estate and allocated the same to the various trust certificates involved as it deemed proper. The application, however, of the money to the principal of the estate and the allocation thereof was done without conferring with the Superintendent of Banks. Opinion The petitioner contends that the respondent erred in determining that the entire amount of $35,000, less expenses in the amount of $3,788.23, constituted ordinary income to it; that the amount it received was merely a partial replacement of lost capital; and that, inasmuch as this amount did not equal, much less exceed, the amount of the capital lost, it did not receive any taxable gain. The respondent in his brief states that he has included the net recovery of the trustee from the Superintendent of Banks as ordinary income for 1942 because: "(1) There is no basis in the record for allocating the amount received between principal and income. A claim or suit covering a number of alleged injuries, including deprivation of profits, loss of income, interest on the foregoing amounts and a demand for the return of capital allegedly lost through the misfeasance or malfeasance of *155 a predecessor trustee, was settled for a lump sum under an agreement which affords no basis forallocating the amount received in settlement between capital and income; "(2) The entire record establishes that the settlement was partly for the restoration of lost profits and income, but it is impossible to ascertain the correct amount allocable to such items. If, in addition to the claim and settlement agreement the oral testimony and contemporaneous memoranda of the men who represented both sides in all settlement negotiations are taken into consideration, the entire record establishes that the final settlement and payment of $35,000 thereunder was a lump sum settlement or compromise. There was no specific allocation either in the final settlement conference or in the settlement agreement on particular securities originally included in the claim, the recovery of double liability payments on certain bank stock or to interest demanded on the foregoing alleged principal losses. Nor was there any contemporaneous oral agreement covering the foregoing points." The respondent concedes that testimony and evidence other than the settlement agreement itself may be considered by the Court *156 in determining whether or not petitioner received, and the Superintendent of Banks paid, the amount of the settlement as an item of income to the trust or as one of trust principal. He contends, however, that since the settlement between the petitioner and the Superintendent of Banks disposed of all possible claims by or on behalf of the beneficiaries for income or profits that were lost due to the predecessor trustee's failure to sell unlawfully purchased or retained securities, the problem of distinguishing principal from income in the settlement becomes too involved for solution. Respondent further contends that petitioner presented a proof of claim for a very substantial capital loss involving twenty-two purchases of land trust certificates, an unlawful retention of 400 shares of the stock of the trustee, a liability for a capital loss of $10,000 and six per cent interest which would constitute income, and that the settlement of $35,000 makes no effort to separate the portion thereof allocated to any of these various items. He denies that it is established that the petitioner at any time abandoned any of its original twenty-two items of claim for self-dealing investments in land *157 trust certificates. He asserts that the office memoranda of both the petitioner and the Superintendent of Banks discloses that the elements of negotiation were uncertain up to the time of the final settlement and that at the final settlement there was no definite and distinct agreement, either verbal or written, as to just how the amount paid in settlement should be allocated to the various claims. Based upon this factual argument respondent then cited Martin Bros. Box Co. v. Commissioner, 142 Fed. (2d) 457; R. J. Durkee, 6 T.C. 773; Raytheon Production Corporation, 144 Fed. (2d) 110; Swastika Oil & Gas Co. v. Commissioner, 123 Fed. (2d) 382; and Arcadia Refining Co. v. Commissioner, 118 Fed. (2d) 1010. Before considering the above citations it would be well to consider the facts in this case. When the petitioner filed its original proof of claim on July 10, 1937, it was successor trustee to a large number of claims arising out of the closing of the Union Trust Company and its liability as a trustee. From the time of its appointment until the statute of limitations ran on July 17, 1937, for the filing of such claims *158 with the Superintendent of Banks, petitioner had but a very short time and adopted a policy of filing a blanket proof of claim to cover every possible item on which there might subsequently develop a liability. Between that time, however, and the beginning of the negotiations in the fall of 1941, petitioner had examined the available evidence to eliminate those cases in which there had not been self-dealing with the result that when Mr. Wilson, representing the petitioner, and Mr. Lindemann, representing the Superintendent of Banks, began their negotiations they were in substantial agreement as to the land trust certificates on which liability could be based. Mr. Wilson in speaking of this preliminary conference said: "Q. Will you, then, read the computations that you made in summary from these green sheets, showing your calculation of the amount of liability on each one of these certificates upon which you found self-dealing? "A. I calculated all of them, and it came to $30,501.02. And I think it is safe to say that Mr. Lindemann and I agreed that was the fact, because we both used the same formula and tried to agree on the market value of the items in question and the income *159 that had been received by them during their regime, and by us later. We had no difficulty in agreeing on what the definite figure of those items amounted to, $30,500." The office memorandum of petitioner dated in September 1941 and another one dated in May 1942 show that petitioner was computing liability on the same land trust certificates as does the office memorandum of the Superintendent of Banks dated July 9, 1942. All of these memoranda also show that both parties were computing liability on the retention of the Union Trust Company stock and the additional liability growing out of the $10,000 assessment thereon. Petitioner's figures on the liability for the land trust certificates differ slightly from those of the Superintendent of Banks in the amount of liability but this difference is no more than could be explained by the different dates involving different market values on said land trust certificates that were current at the time the various computations were made. The computation made by the petitioner in September differs from petitioner's computation in May to about the same degree as both of them differ from the computation of the Superintendent of Banks made in July. *160 As to the retention of the bank stock, including liability for the double assessment, the memorandum of the Superintendent of Banks suggests a liability of $2,129.56 but admits that his total liability otn his bank stock might be increased above his estimate by $7,983.17 in the event of litigation, to take care of the $10,000 double assessment plus interest of $112.73. During the negotiations, while the representative of the Bank Superintendent did not actually exhibit to the representative of petitioner his memorandum concerning his calculation, he did read volubly therefrom and there was a free and frank exchange between the parties on their various items of difference. Mr. Lindemann, the attorney for the Superintendent of Banks, who conducted the negotiations, testified concerning these negotiations that his office staff had prepared a memorandum of all of the land trust certificates which his office considered to be the basis of a loss claim. This memorandum contained all of the certificates set forth in the findings of fact herein plus the Northwestern Building Site and the Charles F. Kurz Property certificates on which the rising market values had removed the basis for loss. *161 This memorandum contained figures showing the operation of the Stone Formula, the names of the specific certificates involved, and the amount which the Superintendent of Banks recognized as a liability. He stated that this memorandum was the basis of all of their conferences and referring to the sheet said: "We were in agreement on these facts as developed on this sheet." Concerning the conference at which his offer in settlement was made, Lindemann testified: "Q. You say you made an offer which had a basis to the extent of $30,000, approximately, as to the Land Trust Certificates shown on that sheet, and then you heard Mr. Wilson testify the balance of $5,000 was paid with respect to the $10,000 liability, Union Trust Company? "A. That is definitely correct. And this was on the Land Trust getting a credit of $29,809. [1] And the difference between that figure and the $35,000 we paid was allocated to this double liability. * * *
"Throughout the negotiations I indicated to him what we were paying for each item and there was no need *162 of any conversation, summing up anything when I handed him the settlement agreement or the check." With the exception of the claim for interest filed with the proof of claim there is no evidence in this record, including the office memoranda, the exhibits and evidence that the items of interest were ever a factor in the negotiations except in the case of the Del Prado land trust certificates. The Stone Formula required that no interest should be allowed after the Superintendent of Banks took over the Union Trust Company and the only manner in which interest figured in these negotiations at all was that the Stone Formula required that four per cent interest should be added to the original investment for the period that the trustee retained the unauthorized investment and from this allowable interest was subtracted the actual income received on the various certificates. In every instance involving land trust certificates, except Del Prado, the income received exceeded the allowable interest and this income had previously been returned for Federal tax purposes and the tax paid thereon. In the case of Del Prado, where the allowable interest exceeded the income received by $297.30, this *163 amount was added to the amount of the lost capital ($4,560) and recovered as a part of the $35,000. This $297.30 must therefore be treated as income received. We are unable to agree with respondent's contention that, since the release in this case purported to release not only the claims of the successor trustee but also the claims of the life beneficiary and the remaindermen, the release, therefore, which did not allocate the interest of the other claimants, makes a separation of principal from income impossible. R. J. Durkee, 6 T.C. 773, one of the cases cited and relied upon by the respondent, was recently reversed by the United States Circuit Court of Appeals for the Sixth Circuit. See R. J. Durkee v. Commissioner, C.C.A. 6, [162 Fed. (2d) 184] decided June 4, 1947. In the Durkee case the taxpayer received $25,000 in settlement of a suit against thirty firms engaged in the electrical contracting business for loss of good will in his business through the tortious acts of defendants. The release executed by the taxpayer at the time of settlement stated that the $25,000 was not only to settle the particular suit referred to, but was also a settlement *164 of all debts, claims, damages, and causes of action whatsoever which existed or might exist in favor of the plaintiff. It was also paid in consideration of a release by Durkee of his claims as a partner of Durkee Electric Company, a partnership then dissolved, and as a stockholder of Durkee Electric R. J., Inc., a corporation. The Circuit Court of Appeals, after pointing out that neither the character nor the size of the additional claims was disclosed and that the recovery in each case could be either taxable income or non-taxable income, said: "There is nothing in the record to show how much of the $25,000 was paid to the plaintiff in settlement of the pending lawsuit, and how much was paid to him in settlement of other claims which he had against the defendants either in his individual capacity, or as a member of the dissolved partnership, or as a representative of the corporation. The Commissioner held all of it to be taxable income. * * * Obviously, a large portion, if not practically all, of the $25,000 received was in settlement of the lawsuit, and under our view of the case was not taxable as a matter of law. The Tax Court should hold further hearings in order to determine *165 the proper allocation between the taxable and non-taxable portions of the amount received in settlement." The remaining cases relied upon by the respondent seem to have little bearing on the facts in the case at bar. In Martin Bros. Box Co. v. Commissioner, supra, the Court of Appeals sustained this Court in a memorandum opinion, in which we said, concerning a lump-sum settlement which the taxpayer claimed to be a capital replacement and which the Commissioner determined to be income: "Also, regardless of inability to apportion the lump sum received, upon consideration of all of the pleadings and the evidence, we are of the opinion that the recovery was not in the nature of capital replacement. Very little, if anything, is found in the pleadings to set out damage to good will, reputation and business set-up." In that case, unlike in the case at bar, there was a complete lack of proof as to how the parties had computed the lump-sum settlement. This situation is exactly the opposite to that disclosed in Arcadia Refining Co. v. Commissioner, supra, in which there was evidence on which the Tax Court was able to separate capital replacement from profit recovered *166 and the Court of Appeals sustained such allocation. In Raytheon Production Corporation v. Commissioner, supra, the Court indicated that the question was not so much one of allocating the lump-sum settlement between replacement of capital, representing damage to good will, and profits as it was of finding a cost basis for the damaged good will and inasmuch as the cost basis was not established the Court assumed that the lump-sum compensation was in excess of the value of the good will and was therefore income to the taxpayer. In Swastika Oil and Gas Co. v. Commissioner, supra, the Court held that "The fund involved must be considered in the light of the claim from which it was realized." In that case the claim as presented and the evidence as introduced showed that the fund received by the taxpayer was income but the decision in that case has little bearing on the case at bar. Our conclusion that the amount recovered on the land trust certificates is income only to the extent that it exceeds the amount of capital lost finds support in Estate of James N. Collins, Deceased, 46 B.T.A. 765, affirmed with Dobson v. Commissioner, 320 U.S. 489. The *167 syllabus in the Collins case when before the Board of Tax Appeals reads as follows: "In 1929 the decedent purchased in the State of Minnesota certain bank stock from the National City Co. of New York. In 1930 and 1931 he sold the stock for less than its purchase price and in his returns for these years claimed deductions for the losses so sustained. The returns for the said years would have disclosed net losses even if the deductions in respect of the above stock sales had not been claimed. In 1935 decedent learned that the bank stock had not been registered in accordance with the Minnesota Blue Sky Laws and in 1937 filed suit against the company for rescission of the contract. The suit was settled by compromise and in 1939 the company paid a sum of money to the decedent as full settlement. The purchase price of the stock paid by decedent exceeds the proceeds of the 1930 and 1931 sales plus the amount recovered in 1939. Held, the money recovered in 1939 does not constitute taxable income to the decedent." It is clear from the evidence, and particularly the testimony of Lindemann, that a part of the $35,000 was paid by the Superintendent of Banks to petitioner to replace a portion *168 of the $10,000 previously paid by it as a double liability assessment on the Union Trust Company stock. The original position of the superintendent was that the amount of this double assessment plus interest of $112.73, or $10,112.73, should be offset against the amount of $7,983.17 which he determined was recovered on the stock in excess of investment. Prior to the settlement, however, he receded from this position, and in view of the possibility that petitioner might recover $37,792.95 ($27,680.22 representing liability of the land trust certificates, plus $10,112.73), he agreed to a settlement of $35,000. Despite the fact that Lindemann testified, as hereinbefore set forth, that approximately $5,000 of the $35,000 was paid in connection with the $10,000 double liability assessment, we are satisfied that the actual amount allocable to this item was $7,319.78, the difference between the settlement figure of $35,000 and the figure which the Superintendent of Banks determined to be the liability on the land trust certificates, $27,680.22. The question arises as to whether some part or all of this $7,319.78 should be treated as income because of deductions taken by the trust in 1935 *169 and 1936 when the double liability assessment was paid in two installments. The first installment of $6,970 was paid in 1935, and the second installment of $3,030 in 1936. The parties stipulated that in 1935 the trust had net capital gains of $9,952.74, in reduction of which was applied the $6,970 paid on double liability, and that the trustee's taxable share of the income on which a tax was paid was reduced by said sum of $6,970, to $2,982.74. They also stipulated that in 1936 the trustee had net capital losses of $12,744.69, and that the payment of $3,030 resulted in no tax reduction or other tax benefit to the trustee. The facts as stipulated are in conflict with the trust's returns for 1935 and 1936, which are attached to and therefore a part of the stipulation, which disclose that the trust realized tax benefits from the deductions taken in both years. Thus, its return for 1935 shows that it deducted from its gross income of $55,676.41, the amount of $11,278.48, which included a claimed ordinary loss of $6,970, in arriving at its net income of $44,397.93; and its return for 1936 shows that it deducted from its gross income of $66,453.25, the amount of $7,940.26, which included *170 a claimed ordinary loss of $3,030, in arriving at its net income of $58,512.99. In both years, therefore, the trust treated the installments paid on the double assessments as normal loss deductions and received tax benefits. To the extent that the installments so paid were recovered, they are includible in income under the tax benefit doctrine - that where a taxpayer, by virtue of a deduction, paid less tax than would have been paid if the deduction were not taken, a subsequent recovery by the taxpayer of all, or a part, of the amount previously deducted, should be reported as a part of gross income in the year of recovery to the extent that taxable income of any prior year was offset by the deduction. Hurd Millwork Corporation, 44 B.T.A. 786; Estate of William H. Block, 39 B.T.A. 338, affd. 111 Fed. (2d) 60; cert. denied 311 U.S. 658, and cases cited therein; Dobson v. Commissioner, supra.Petitioner recovered $7,319.78 of the $10,000 previously paid. Our conclusion from the foregoing is that of the $35,000 which the petitioner recovered from the Superintendent of Banks, $7,617.08 ($7,319.78 plus $297.30) represented *171 income and $27,382.92 a recovery of capital. In view of the fact that petitioner incurred expenses of $3,788.23 in prosecuting its claim, and that its net recovery was therefore $31,211.77, the expenses should be prorated over the amounts representing income and return of capital, and the income of $7,617.08 reduced by its prorata share of the expenses. The income as so reduced should have been reported by petitioner in its return for the taxable year 1942. Decision will be entered under Rule 50. Footnotes
1. Land trust certificates were actually credited with $27,680.22. See Superintendent of Banks computation of loss shown in our findings.↩